# EXHIBIT C

## EXPERT REPORT OF PROFESSOR ADAM J. LEVITIN

### Introduction

1.  My name is Adam Jeremiah Levitin.  I was retained by the Sturdevant Law Firm ("Counsel"), counsel to Plaintiff Deborah Tamburri ("Tamburri"), to provide expert testimony regarding the securitization industry in *Tamburri v. Suntrust Mortgage, Inc. et al.*, No. C-11-2899 EMC (N.D. Cal.).

2.  I have read the Third Amended Complaint (the "Complaint") in this litigation and am so acquainted with the allegations in this case regarding the conduct of the defendants SunTrust Mortgage, Inc.  ("SunTrust"), Wells Fargo Bank, N.A. ("Wells Fargo"), U.S. Bank, Nat'l Ass'n ("U.S. Bank"), Mortgage Electronic Registration Systems, Inc. ("MERS"), ReconTrust Company, N.A. ("ReconTrust"), and Does 1-20 (collectively with SunTrust, Wells Fargo, U.S. Bank, MERS, and ReconTrust, the "Defendants").

### Professional Background and Qualifications

3.  I am currently the Bruce W. Nichols Visiting Professor of Law at Harvard Law School in Cambridge, Massachusetts.  I am also a tenured Professor of Law at the Georgetown University Law Center in Washington, D.C., where I have taught since 2007.  I teach courses in structured finance, bankruptcy, consumer finance, contracts, payment systems, and commercial finance.

4.  I also currently serve as a Directorial appointee to the statutory Consumer Advisory Board (CAB) of the Consumer Financial Protection Bureau, 12 U.S.C. § 5494, and am Chair of the CAB's Mortgage Committee. The views expressed in this opinion are solely my own and not those of the CAB or the Consumer Financial Protection Bureau.

5.  From 2008-2010 I served as Special Counsel for Mortgage Affairs to the Congressional Oversight Panel that supervised the Troubled Asset Relief Program (TARP).  In that position I was in charge of the Oversight Panel's extensive reporting on the government's response to the mortgage crisis, with particular emphasis on mortgage servicing issues.  In this role, I undertook significant research into the servicing industry, including interviewing officers and employees of numerous servicers.

6.  I have also previously served as the Robert Zinman Scholar in Residence at the American Bankruptcy Institute, as a faculty member for the Practicing Law Institute's Consumer Financial Services program, and as the faculty instructor for the Federal Trade Commission's training program for its Division of Financial Practices personnel.  I am also a member of the Mortgage Finance Working Group (MFWG) convened by the Center for American Progress. The MFWG has produced one of the major proposals for the reform of the US housing finance system and presented the proposal before the Treasury Department, Department of Housing and Urban Development, and the President's Council of Economic Advisors.

7.  Since 2008, I have testified nineteen times before Congress on financial regulatory issues, including at eight hearings dealing specifically with housing finance, securitization and mortgage servicing, before the Government Accountability Office on housing policy issues twice, and before the Financial Crisis Inquiry Commission about mortgage securitization.

8.  I have served as an expert for the New York Attorney General in relation to the National Mortgage Servicing Settlement and as a Volunteer Deputy Attorney General for the State of Delaware for mortgage servicing litigation involving Defendant MERS.  I have also served as an expert in several private foreclosure or mortgage servicing-related litigations.

9.  I have presented on mortgage securitization and servicing at Federal Reserve, FDIC, and industry conferences, and I consult informally with members of Congress, the Consumer Financial Protection Bureau, the Federal Reserve, International Monetary Fund, World Bank, and non-profit policy groups on various aspects of financial regulation.

10.  The securitization industry and its role in the financial crisis is a major focus of my academic research.  I have authored over forty academic articles and book chapters and encyclopedia entries, nearly half of which address the securitization, housing finance industry or the financial crisis of 2008.  I have also co-authored the most extensive academic treatment of the mortgage servicing industry.

11.  My work has been published in leading law and real estate journals and has been awarded prizes from the American College of Consumer Financial Services Lawyers, the *American Bankruptcy Law Journal*, the George Washington University Center for Law, Economics and Finance, and the *Yale Journal on Regulation*.

12.  In 2013, I received the American Law Institute's Young Scholar's Medal, which is awarded to "one or two outstanding early-career law professors whose work is relevant to the real world and has the potential to influence improvements in the law."

13.  I serve as a peer reviewer for *Cityscape*, a housing journal published by the Department of Housing and Urban Development and for *Housing Policy Debate,* the leading housing policy journal (formerly published by the Fannie Mae Foundation).  A complete list of my academic publication may be found as part of my curriculum vitae, which is attached as Appendix A to this report.

14.  I hold a J.D., *cum laude* from Harvard Law School.  I also hold a Bachelor of Arts (A.B.) degree *magna cum laude with highest honors in field* from Harvard College, a Master of Arts (A.M.) degree and a Master of Philosophy degree (M.Phil) from Columbia University.

15.  I have served as law clerk to Judge Jane R. Roth on the United States Court of Appeals for the Third Circuit.  I am admitted to practice before the bars of the State of New York, the Third Circuit, the Southern District of New York, and the Eastern District of New York.

16.  Based on the foregoing experiences as well as my research following my engagement in this case, I am familiar with the mortgage securitization industry, including the

roles of securitization trustees, servicers, deed of trust trustees, and MERS, and the specifics of the instant litigation.

17.   My compensation for preparing this report and for any testimony in this case is at the rate of $700/hour. A list of the sources I consulted in preparing this report, as required by Federal Rule of Civil Procedure 26(a)(2)(B)(ii) may be found in Appendix B to this report. As required to be disclosed per Federal Rule of Civil Procedure 26(a)(2)(B)(v)-(vi), my other testimonies as an expert at trial or by deposition in the past four years were in *In re Chase Bank USA, N.A. "Check Loan" Contract Litigation*, MDL 2032 (N.D. Cal.), *In re Washington Mutual Mortg. Backed Sec. Litig.*, No. C09-037 MJP (W.D. Wash.), *In the matter of the application of The Bank of New York Mellon*, No. 651786/2011 (N.Y. Sup. Ct.), and before the Financial Crisis Inquiry Commission.

**Summary of Opinions Offered**

18.   Plaintiff's Counsel has requested that I prepare this report to address the roles played by the various defendants in regard to Ms. Tamburri's December 2006 refinancing mortgage loan from SunTrust (the "Tamburri mortgage"), which was apparently subsequently securitized into the STARM Mortgage Loan Trust 2007-2.[1] Specifically, Counsel has requested that I address the economic incentives created by the securitization of Ms. Tamburri's mortgage loan for each of the defendants, and how this relates to the Defendants' alleged behavior, particularly how their constant "buck passing," in which none of the Defendants would acknowledge owning Ms. Tamburri's mortgage loan and instead in response to her frantic efforts to save her home gave her "the runaround" while recording materially false documents about her mortgage that Defendants' lacked authority to execute. Given that Defendants had all of the information necessary to make accurate representations to Ms. Tamburri and the public about her mortgage, their behavior was not merely negligent or incompetent. Instead, Defendants were willfully blind, as their economic incentives encouraged them to staff their operations with poorly compensated, poorly trained, and poorly supervised employees.

19.   Simply put, Defendants designed and operated their businesses in a way that problems like those experienced by Ms. Tamburri were inevitable and foreseeable, but just treated as an acceptable cost of business, not least because the cost was borne by others. The securitization of Ms. Tamburri's mortgage separated the beneficial economic interest in the mortgage from both legal title to the mortgage and from the management or "servicing" of the mortgage. The compensation of the parties that hold legal title to and service the loan incentivizes them to take minimal care in regard to the management of the loan and set the stage for the national mortgage servicing crisis and for the Defendants' handling of Ms. Tamburri's loan in particular. None of the Defendants was compensated to take responsibility for Ms. Tamburri's

---

[1] In this report I use the term "mortgage" colloquially to refer to both the promissory note Ms. Tamburri made out to SunTrust and to the security instrument (in this case a deed of trust) that pledged Ms. Tamburri's house as collateral for the promissory note.

loan or to be diligent, much less punctilious in its legal compliance. None of the Defendants had an interest in "getting it right," because the costs of getting it wrong are borne not by the Defendants but by mortgage-backed securities investors, Ms. Tamburri, and ultimately the public because of the debasement of the real property title system.

## I. THE TAMBURRI MORTGAGE

20.   On December 12, 2006, Plaintiff Deborah Tamburri refinanced the mortgage on her Contra Costa county home of twenty-three years with an interest-only adjustable rate mortgage loan from SunTrust. Complaint, ¶¶ 37, 39. The loan was for $640,000. It had an initial ten-year interest-only period, with the principal then to be amortized over the remaining twenty-years of the loan's term. Tamburri Adjustable Rate Note.

21.   The loan was evidenced by a promissory note. SunTrust was the "Lender" under the promissory note.

22.   The loan was also secured by a deed of trust ("DOT"), pursuant to which Ms. Tamburri conveyed her Contra Costa county home in trust to Jackie Miller as trustee with power of sale. As DOT trustee, Ms. Miller held the deed to the Contra Costa county home in trust for the trust beneficiary, which was designated as "MERS (solely as nominee for Lender and Lender's successors and assigns)", with the "Lender" again defined as SunTrust.

23.   DOT trustees play a purely ministerial role in mortgage lending. *See, e.g.*, Pro Value Properties, Inc. v. Quality Loan Service Corp., 170 Cal. App. 4th 579, 583 (Cal. App. 2d Dist. 2009).   DOT trustees function as agents of DOT beneficiaries, as the DOT trustee is selected by the DOT beneficiary and may be replaced at will by the DOT beneficiary. Tamburri DOT ¶ 24.

24.   While the DOT trustee holds the deed for the collateral property in trust for the DOT beneficiary, the DOT trustee has no economic interest in the loan and does not collect payments on behalf of the beneficiary.   Instead, the DOT trustee simply holds the deed as long as the borrower is current on payments.   If the borrower pays off the loan, the DOT trustee reconveys the deed to the borrower and the reconveyance is recorded in the county land records. CAL. CIV. CODE § 2941. If, on the other hand, the borrower defaults on the loan, the DOT trustee exercises its power of sale under the DOT to foreclose on behalf of the DOT beneficiary.   Frequently, the initial DOT trustee is a local lawyer or title company.   After a default, however, the DOT beneficiary will often exercise its power to substitute in a DOT trustee of its choosing with an eye toward increasing foreclosure sale recoveries.

25.   MERS was recorded as the original DOT beneficiary for the Tamburri DOT, but MERS explicitly disclaims any economic interest in the Tamburri mortgage.   Blake Deposition at 53, 62.   Instead, MERS merely serves as a nominee for certain other parties involved in the Tamburri mortgage.

26.   MERS is a subsidiary of MERS Corp. Holdings Inc.   Blake Deposition Transcript at 17.   MERS Corp. Holdings Inc. is owned by a number of large financial institutions. *See* Complaint, Delaware v. MERSCorp, Inc., No. 2011-10-27 (Del. Ch. Ct., Oct. 27, 2011) ¶ 23; Culhane v. Aurora Loan Servs., 826 F. Supp. 2d 352, 368 (D. Mass.

2011) (Young, J.); David P. Weber, *The Magic of the Mortgage Electronic Registration System: It Is and It Isn't*, 85 AM. BANKR. L.J. 239 (2011). MERS operates a private mortgage registry that uses a book entry system to track ownership of mortgage servicing rights (and in some cases the actual ownership of mortgages).[2] Financial institutions pay MERS a fee to be members and be able to utilize its registry services by registering the loans they service (but do not necessarily own) with MERS' electronic database. Each registered loan receives a unique identifier known as a MERS Identification Number (MIN). The MIN is sometimes stamped on the note or sometimes simply recorded in the lender's own records. MERS is then inserted in the local land records as the DOT beneficiary, instead of the actual lender.

27.     MERS' serves as the DOT beneficiary of record, but only as a nominee for the actual lender and supposedly for its successors and assigns. Christopher L. Peterson, *Two Faces: Demystifying The Mortgage Electronic Registration System's Land Title Theory*, 53 WM. & MARY L. REV. 111, 118 (2011). MERS claims no beneficial interest whatsoever in the loan. MERS' goal is to immobilize mortgage title through a common agency structure. When a mortgage is transferred between MERS' members, legal title to the beneficial interest in the DOT remains in MERS' name. The change in the beneficial interest in the DOT is supposed to be tracked in MERS' database, but it is not apparent in county land records, as MERS remains the recorded DOT beneficiary by virtue of its common agency design. This common agency structure is designed to avoid paying county recordation fees.

28.     In theory, MERS' database tracks two distinct things: the identity of the party currently with the rights to service the mortgage (often an agent for the actual DOT beneficiary) and the actual DOT beneficiary. MERS database is often inaccurate or incomplete. *See, e.g.*, Complaint, Delaware v. MERSCorp, Inc., No. 2011-10-27, Compl. ¶ 8 (De. Ch. Ct., Oct. 27, 2011) (alleging 21% inaccuracy rate for MERS recording in a 100-loan sample); AEQUITAS COMPLIANCE SOLUTIONS, INC., FORECLOSURE IN CALIFORNIA: A CRISIS OF COMPLIANCE 13 (2012), *available at* http://aequitasaudit.com/images/aequitas_sf_report.pdf (MERS records matched with deed of trust beneficiary only 42% of time); Alan M. White, *Losing the Paper— Mortgage Assignments, Note Transfers and Consumer Protection*, 24 LOYOLA CONS. L. REV. 468, 486-87 (2012). MERS' members are nominally required to report transfers of mortgage servicing rights to MERS, but MERS does not actually compel reporting of servicing rights transfers and there is little incentive to be punctual with reporting. Complaint, State of Delaware v. MERSCORP, Inc. and Mortgage Electronic Registration Systems, Inc., No. 6987 (Del. Chan. Ct., Oct. 27, 2011) at 4, 34-40. MERS does not generally audit its members. Indeed, the lack of record validation combined with voluntary reporting has led a federal district judge to describe MERS as "the Wikipedia of land registration systems." Culhane v. Aurora Loan Servs., 826 F. Supp. 2d 352, 368 (D. Mass. 2011) (Young, J.).

29.     MERS does not even formally require any reporting of actual beneficial ownership in a mortgage, much less of transfers of beneficial ownership; any information about

---

[2] I express no opinion here regarding the validity of the MERS system, but merely note that MERS is wholly a private-law creation and is not explicitly sanctioned by any statutory or regulatory framework.

beneficial ownership is supplied through strictly voluntary reporting. Christopher L. Peterson, *Two Faces: Demystifying The Mortgage Electronic Registration System's Land Title Theory*, 53 WM. & MARY L. REV. 111, 117, 127 (2011). Instead, MERS' database functions as a do-it-yourself private mortgage recordation system.

30.   Despite covering approximately 60% of the mortgages in the United States, MERS does not itself have any actual employees. MERS Corp. Holdings, Inc. has historically had only around 50 employees, who perform corporate and technology support functions for MERS. Complaint, State of Delaware v. MERSCORP, Inc. and Mortgage Electronic Registration Systems, Inc., No. 6987 (Del. Chan. Ct., Oct. 27, 2011), ¶ 15 (referencing entire MERS system, including MERS Corp. Holdings, Inc.).

31.   Instead, employees of MERS' members carrying out most of the tasks done in MERS' name, including the making of entries in the MERS database. These employees of MERS' members are listed as assistant secretaries or vice presidents of MERS, but they have no actual employment relationship with MERS. There are over 20,000 of these "corporate signing officers." Christopher L. Peterson, *Two Faces: Demystifying The Mortgage Electronic Registration System's Land Title Theory*, 53 WM. & MARY L. REV. 111, 117, 127 (2011). These "corporate signing officers" have authority to sign for transfers within as well as in and out of the MERS system. Accordingly, a transfer of either servicing or beneficial ownership in the MERS system involves nothing more than an employee of a MERS' member entering the transfer in the MERS database, and a transfer of DOT beneficiary status from MERS to another party would involve nothing more than a MERS corporate signing officer filing the appropriate documents in a county recording office in MERS' name. MERS does not generally audit the activities of its corporate signing officers. Blake Deposition at 87.

32.   MERS is under a Consent Order with the Office of the Comptroller of the Currency, the Board of Governors of the Federal Reserve, the Federal Deposit Insurance Corporation, the Office of Thrift Supervision, and the Federal Housing Finance Agency for having "failed to exercise appropriate oversight, management supervision, and corporate governance," having, "failed to devote adequate financial, staffing, training, and legal resources to ensure proper administration and delivery of services," having "failed to establish and maintain adequate internal controls, policies, procedures, compliance risk management, and internal audit and reporting requirements with respect to the administration and delivery of services." Consent Order, *In the Matter of* MERSCORP, Inc. and the Mortgage Electronic Registration Systems, Inc., OCC No. AA-EC-11-20, April 13, 2011, Art. II, ¶4. MERS is also party to a similar settlement with the Delaware Attorney General, dated July 13, 2012.

33.   In this case, an assignment of the DOT beneficiary interest from MERS to UBS was purportedly authorized by Ms. Tina Sevillano. Ms. Sevillano was an "assistant secretary, assistant vice president, and vice president of MERS pursuant to a corporate resolution that was issued to her employer." Blake Deposition at 80. She received no compensation from MERS. *Id.* at 80-81.

34.   Even if one assumes that the MERS system is valid, it is still subject to basic principles of agency law: a party that is not a MERS corporate signing officer has no authority to transfer mortgages in or out of MERS. Thus, I cannot transfer the mortgage on my neighbor's house from MERS to my cousin, as I have no authority to transfer MERS' property.

## II. An Overview of the Mortgage Securitization Transaction

35.   SunTrust subsequently sold the Tamburri mortgage to UBS, which securitized the Tamburri mortgage. This securitization and the incentives it created for the Defendants set the stage for the Defendants' alleged wrongful acts. The details of the securitization are complicated, but they should not overshadow an important fact: none of the financial institutions involved in the securitization: SunTrust, UBS, Wells Fargo, US Bank, MERS, or ReconTrust, had any financial interest in the ultimate performance of the Tamburri mortgage by virtue of its participation in the securitization. The Defendants' compensation for their roles vis-à-vis the Tamburri mortgage was unrelated to the ultimate performance of the mortgage. Instead, the Defendants were compensated for different work, but in no case did their compensation depend on the accuracy of their work. To the contrary, if losses on the mortgage were greater because of a botched foreclosure, the losses are borne by the investors in the mortgage, but not by the Defendants, and securitization investors have generally been frustrated in their attempts to force servicers and trustees to bear the costs of improper and illegal mortgage servicing.

36.   Securitization is a financing mechanism based on segregating selected cashflows of a firm from the firm's liabilities in order to enable investment based solely on the risks inherent in the selected cashflows, rather than in the total package of the selected cashflows' risks as well as all of the firm's other assets and liabilities.

37.   Thus, with mortgage securitization, the idea is that investors will be able to invest solely in the risks associated with the mortgages (credit risk and interest rate risk), rather than in all the risks attendant to an investment in a mortgage lender as an operating entity, such as agency risk[3] and asset substitution risk.[4]

38.   Private-label residential mortgage securitizations—meaning those mortgage securitizations not guaranteed by the federal government or government-sponsored entities—are accomplished by segregating the mortgages into a "bankruptcy remote" entity.[5] In the typical private-label residential mortgage securitization, this is done in a four-step process:

- First, a mortgage loan is made ("originated") by a lender (the "originator").

---

[3] E.g., the risk the firm's managers will make bad and possibly self-interested decisions regarding the firms' assets and liabilities.

[4] E.g., the risk the firm will substitute credit card receivables for mortgages as its assets.

[5] This report refers solely to private-label residential mortgage securitizations, like the STARM Mortgage Loan Trust 2007-2. The structure of Ginnie Mae, Fannie Mae, and Freddie Mac securitizations is distinctive.

- Second, the mortgage loan is accumulated in a pool of thousands of similar mortgage loans by a financial institution (the securitization "sponsor" or "seller"), which may or may not also be the originator.

- Third, the sponsor then sells the pool of mortgage loans to a special-purpose subsidiary (the "depositor") that has no other assets or liabilities in order to segregate the mortgages from the sponsor's own assets and liabilities. This transfer is to make the mortgages "bankruptcy remote" meaning that they cannot be consolidated with those of the sponsor in the event the sponsor files for bankruptcy or is placed in an FDIC receivership.

- Fourth, the depositor sells the mortgage loans to a special purpose entity, typically a trust. The trust pays for the mortgage loans by issuing certificates of beneficial interest (similar to bonds), which the depositor then sells to its underwriting affiliate, which in turn resells the certificates to fixed-income investors. The fixed-income investors are generally institutional investors such as pension funds, insurance companies, banks, and various types of investment funds, such as hedge funds and collateralized debt obligations.

This set of transfers of the mortgage loan from the originator to the sponsor to the depositor to the trust can be thought of algebraically as $A$ to $B$ to $C$ to $D$.

39.     In the case of the Tamburri mortgage, the loan was originated by SunTrust. It was apparently subsequently sold to UBS Real Estate Securities, Inc. ("UBS").[6] UBS apparently securitized the loan, along with around a thousand other loans originated by SunTrust, into the STARM Mortgage Loan Trust (the "STARM Trust"),[7] which involved a transfer from UBS to its subsidiary Mortgage Asset Securitization Transactions, Inc. ("MAST"), and then a transfer from MAST to the STARM Trust with U.S. Bank as trustee. U.S. Bank's role as securitization trustee for the STARM Trust, discussed below in ¶¶ 67-69, should not be confused with the distinct role of DOT trustee for Tamburri loan, which is discussed above in ¶¶ 22-24.

40.     While the Tamburri promissory note was supposedly transferred from SunTrust to UBS to MAST to US Bank as trustee ($A$ to $B$ to $C$ to $D$), the beneficial interest in the Tamburri DOT remained recorded in MERS' name. This recording would be valid if, and only if, MERS were the common agent for $A$, $B$, $C$, and $D$. Otherwise, the recording would cease to accurately reflect the DOT beneficiary or its agent. As discussed below in ¶ 17, MERS does not appear to have been a common agent for all

---

[6] I express no opinion here as to whether the transfers were in fact undertaken, were in compliance with the relevant transaction documents, or effective to give the STARM Mortgage Loan Trust 2007-2 (and its agents) rights in the Tamburri mortgage, including the right to foreclose under California law when and in the fashion it did. Instead, my opinion here is confined to the incentives the securitization process created for the Defendants to ensure that their servicing and documentary procedures in regard to the Tamburri loan were adequate and legally compliant *assuming* that the STARM Mortgage Loan Trust 2007-2 would have the right to foreclose on the Tamburri mortgage following the alleged payment default by Ms. Tamburri on or about August 2009. This assumption is founded upon the assumption that the transfers of Ms. Tamburri's mortgage loan were effective and valid, but I make this assumption only for purposes of the counts contained in the Third Amended Complaint.

[7] STARM is apparently an acronym for SunTrust Adjustable Rate Mortgage and is the designation of a particular "shelf" of mortgage-backed securities.

four parties. In any event, MERS remained the DOT beneficiary of record until June 21, 2010, when a document was recorded that purported to transfer the beneficial interest in the DOT from MERS to US Bank. Issues relating to the validity of this transfer are discussed below in ¶¶ 80-89.

41.    A securitization trustee's function is primarily ministerial. Beyond holding title to the mortgages, the major responsibilities of a securitization trustee are: to verify that the mortgage loans deposited in trust have the proper documentation; to remit payments received by the trust to the certificateholders, to make periodic reports to the certificateholders on trust performance; and to serve as a financial backstop for the servicer, so that if the servicer ceases to perform its duties, the trustee will take over the servicing function or hire a third party to do so. *See, e.g.,* Jason H.P. Kravitt, SECURITIZATION OF FINANCIAL ASSETS (2D ED. 2003), § 9.01[B][3].

42.    The particular ministerial tasks a trustee performs depend on the securitization; sometimes the ministerial tasks are contracted out to various agents, such as document custodians, payment agents, and trust administrators. The trustee does not handle the daily management of the mortgages. In the case of the Tamburri mortgage, most of the ministerial tasks typically handled by a securitization trustee were in fact assigned to Wells Fargo as Trust Administrator. U.S. Bank played little direct role regarding the Tamburri mortgage other than holding legal title to the mortgage. U.S. Bank was, however, responsible for ensuring that Wells Fargo fulfilled its obligations as Master Servicer. In essence, U.S. Bank was renting itself out as a legal fiction, much like MERS for the DOT.

43.    The three transfers of the Tamburri mortgage are covered by two transactional documents. First, the transfer from SunTrust to UBS is governed by a contract called a Purchase, Warranties and Servicing Agreement ("PWSA"). Second, the transfer of the mortgage from UBS to MAST and the transfer of the mortgage from MAST into the STARM Mortgage Loan Trust 2007-2 (the "STARM Trust") are governed by a document known as a Pooling and Servicing Agreement ("PSA"). The PSA is also the document that creates the STARM Trust, provides the terms of the obligations of the securitization trustee and trust administrator and master servicer (and some other entities that are not relevant to this litigation), and provides for the issuance of the STARM Trust certificates (the mortgage-backed securities or MBS).

44.    The PSA also provides for the "servicing" or management of the mortgage loans. Mortgage need to be managed. Billing statements must be mailed, payments collected, and defaults addressed. This managerial function for the loans is known as "servicing" and is performed by an entity known as a "servicer."

45.    The servicing function is distinct from the legal and beneficial ownership of the mortgage loan, although it can be combined with either or both. Thus, before SunTrust transferred the Tamburri mortgage to UBS, SunTrust was the legal owner of the mortgage loan (or at least of the promissory note), was the beneficial owner of the loan, and was the servicer of the loan.

46.    Both the PWSA and the PSA cover the servicing as well as the sale of the mortgages. Thus, while the PWSA purported to effectuate SunTrust's sale of the legal and beneficial ownership of the Tamburri mortgage to UBS, it provided for servicing of

the Tamburri mortgage to be retained by SunTrust. Similarly, while the PSA purported to transfer legal and beneficial ownership of the Tamburri mortgage to the STARM Mortgage Loan Trust 2007-2, it did not transfer the servicing of the loan, which remains with SunTrust (which is in fact not even a party to the PSA). The PSA does, however, appoint Wells Fargo as "Master Servicer," to oversee the various servicers (typically originators) of the loans in the STARM Mortgage Loan Trust 2007-2.

## III. COMPENSATION AND INCENTIVES IN THE SECURITIZATION TRANSACTION

47.     Once securitized, several parties were involved in the administration of the Tamburri mortgage: SunTrust as servicer, Wells Fargo as master servicer, US Bank as trustee for the STARM Trust, MERS as DOT beneficiary, and (as of June 2010) ReconTrust as DOT trustee. UBS ceased to have any involvement with the Tamburri mortgage once it was securitized.

48.     Each of these parties to the Tamburri mortgage securitization was compensated for its involvement in the securitization. The compensation structures for the Defendants varies, but in each case it incentivizes the Defendant to spend little effort ensuring that defaulted loans are handled properly. The cost of mistakes is borne not by the Defendants' but by the certificateholders and Ms. Tamburri.

*Sun Trust*

49.     SunTrust is the servicer for the STARM Trust and thus for the Tamburri mortgage. As servicer, SunTrust is responsible for the daily management of the mortgages in the STARM Trust, and is the party subject to federal mortgage servicing regulations under the Real Estate Settlement Procedures Act and Regulation X thereunder. SunTrust's duties as servicers that are relevant to this litigation are collecting payments on the mortgages and remitting them to the Master Servicer and, if a loan defaults, handling the default per the standards required by the PSA, including commencing a foreclosure and managing the foreclosure process. The PWSA requires that SunTrust:

> shall service and administer the Mortgage Loans in accordance with this Agreement and with Accepted Servicing Practices and shall have full power and authority, acting alone, to do or cause to be done any and all things in connection with such servicing and administration which [it] may deem necessary or desirable and consistent with the terms of this Agreement and with Accepted Servicing Practices and exercise the same care that it customarily employs for its own account. Except as set forth in this Agreement, [SunTrust] shall service the Mortgage Loans in strict compliance with the servicing provisions of the [Fannie Mae Sellers'] and [Freddie Mac Servicers'] Guides (special servicing option, which include, but are not limited to, provisions regarding the liquidation of Mortgage Loans; the collection of Mortgage Loan payment…

PWSA § 4.01, TAMBURRI DEF001524. "Accepted Servicing Practices" are defined in the PWSA as "those mortgage servicing practices (including collection

procedures) of prudent mortgage banking and mortgage lending institutions which service mortgage loans of the same type as such Mortgage Loan in the jurisdiction where the related Mortgage Property is located, and which are in accordance with applicable law and [Fannie Mae] and/or [Freddie Mac] servicing practices and procedures." PWSA § 1.01, TAMBURRI DEF001509.

50.   A key component of Fannie Mae and Freddie Mac servicing practices is the utilization of state-by-state foreclosure timelines. *See, e.g.,* Freddie Mac Single Family Seller/Servicer Guide, Vol. 2, § 66.30 (requiring compliance with timelines); Freddie Mac Single Family Seller/Servicer Guide, Vol. 2, Exhibit 83A (schedule of adjustments to servicer compensation for timeline noncompliance).   A slower foreclosure can result in greater losses for the investor in a mortgage loan (such as Fannie Mae or Freddie Mac, or in the case of the STARM Trust, the certificate holders).   Therefore, investors insist on foreclosure timelines, with servicer compensation docked for failure to meet timelines.  Servicers are thus pressured to meet foreclosure timelines.

51.   While a failure to comply with legal requirements can significantly delay a foreclosure, servicers are also aware that the vast majority of foreclosures are uncontested, and nonjudicial foreclosures, in particular are unlikely to receive meaningful scrutiny.  Therefore, servicers like SunTrust are incentivized to ensure that foreclosures happen faster, even at the expense of legal compliance.

52.   Significantly, SunTrust has no stake in the ultimate performance of the Tamburri mortgage.  SunTrust receives three different types of servicing compensation, none of which relates to the performance of the Tamburri mortgage.

53.   First, SunTrust receives a monthly "servicing fee".  This fee is the quotient of the product of 37.5 basis points (.375%) multiplied by the unpaid principal balance ("UPB") of the mortgages in the STARM Trust in the previous month divided by twelve.  Hyle Deposition Rough Transcript, Vol. 2 at 31-34.  Algebraically, it can be expressed as:

$$Monthly\ servicing\ fee = \frac{.00375 * UPB}{12}$$

54.   The servicing fee is the senior-most claim on the mortgages in the STARM Trust and is deducted by SunTrust off the top from any interest payments received by SunTrust from borrowers.  Hyle Deposition Rough Transcript Vol. 2 at 35; PSWA §4.05, DEF001526.   SunTrust's servicing fee is effectively senior to all other claims on funds collected from homeowners or from foreclosure sales, etc.

55.   SunTrust is also permitted to keep various ancillary fees, such as late fees and any other fees it can legally charge homeowners.  Amended and Restated Purchase, Warranties and Servicing Agreement between UBS and SunTrust, dated as of Dec. 1, 2004, § 6.03, TAMBURRI DEF001531.  Finally, SunTrust can keep the "float" income on funds it collects before it has to remit them to the Master Servicer. SunTrust has to remit funds to the Master Servicer on the 18th of the month or the previous Business Day if the 18th is not a Business Day (with a Business Day defined in the PSWA and PSA to exclude weekends and certain holidays).  PWSA § 1.01, TAMBURRI DEF001509; PSA § 1.01, TAMBURRI DEF001601. Thus, SunTrust is

11

getting up to 18 days of float income a month.  The PSA restricts how SunTrust can invest the funds in its control.  Reconstituted Purchase, Warranties, and Servicing Agreement, Dated Mar. 30, 2007 between MAST and SunTrust, § 3, TAMBURRI DEF001592.

56.    This compensation structure means that SunTrust is compensated quite well for servicing loans that are performing, as all it is doing is transaction processing, meaning mailing out monthly invoices and cashing the checks sent in response.  This sort of transaction processing can be highly automated and does not require highly trained or skilled workers or much in the way of discretion or judgment.  When loans become delinquent, however, SunTrust's compensation becomes more complicated, for while it can collect more ancillary fees it also has much greater expenses, both in terms of person-hours that must be spent on a defaulted loan and because it has an obligation to advance delinquent mortgage payments to the STARM Mortgage Loan Trust 2007-2 so long as recovery of the advances from the mortgagor or its property are reasonably foreseeable.  PSWA § 5.03, TAMBURRI DEF001530.    SunTrust's advances are reimbursed—but without interest—from any recovery from the mortgagor (such as foreclosure sale proceeds), and if that is insufficient, then from the payments on the other mortgages held by the trust.   Advances can place significant liquidity strains on a servicer.

57.    The total picture of servicer compensation is complicated, but basically a servicer is likely to make more money on a defaulted loan for several months because of the additional ancillary fee income (such as late fees equal to 5% of monthly payments), but after a while the cost of advancing delinquent payments (which grows at a compounded rate) outstrips the ancillary fee income.   Adam J. Levitin & Tara Twomey, *Mortgage Servicing*, 28 YALE J. ON REG. 1 (2011).   Thus, servicers are often incentivized to let loans sit in delinquency for several months before moving ahead with foreclosure.

58.    Moreover, as effectively the senior creditor of the trust, servicers such as SunTrust are incentivized to foreclose rather than restructure a defaulted loan, even if a restructuring would maximize value for the trust, because the foreclosure results in a certain recovery of funds for the servicer.   Adam J. Levitin & Tara Twomey, *Mortgage Servicing*, 28 YALE J. ON REG. 1 (2011).

59.    SunTrust's compensation thus incentivized it to put minimal resources into servicing the Tamburri loan once it became delinquent.  Indeed, SunTrust's employee who dealt with Ms. Tamburri and responded to her alleged Qualified Written Request did not even know what SunTrust's role was with the mortgage, were unaware that SunTrust was the servicer, not the Master Servicer, that Wells Fargo was the Master Servicer and not the investor, and were unaware that the loan was securitized or what the STARM Trust was.  Bryce Deposition Transcript at 68-74, 112-114.

*Wells Fargo*

60.    Wells Fargo is the Master Servicer for the STARM Trust.  Wells Fargo's duties as Master Servicer are to supervise SunTrust as servicer and ensure that SunTrust is properly servicing the securitized loans:

supervise, monitor and oversee the obligation of the Servicer to service and administer their respective Mortgage Loans in accordance with the terms of the Servicing Agreement and shall have full power and authority to do any and all things which it may deem necessary or desirable in connection with such master servicing and administration. In performing its obligations hereunder, the Master Servicer shall act in a manner consistent with this Agreement, subject to the prior two sentences, and with customary and usual standard of practice of prudent mortgage loan master servicers. Furthermore, the Master Servicer shall oversee and consult with the Servicer as necessary from time to time to carry out the Master Servicer's obligations hereunder, shall receive, review and evaluate all reports, information and other data provide to the Master Servicer by the Servicer and shall cause the Servicer to perform and observe the covenants, obligations and conditions to be performed or observed by the Servicer under the Servicing Agreement. The Master Servicer shall independently and separately monitor the Servicer's servicing activities with respect to each related Mortgage Loan…

STARM Mortgage Loan Trust 2007-2 Pooling and Servicing Agreement Dated as of Mar. 1, 2007 (hereinafter "PSA"), § 3.01, TAMBURRI DEF001646. To this end, SunTrust is obligated to report significant information about the loans to Wells Fargo on a monthly basis. TAMBURRI DEF001995, DEF002002-2014.

61.   Wells Fargo as Master Servicer is responsible for reporting servicer non-compliance with the Servicing Agreement to the Trustee. PSA § 3.02(a), TAMBURRI DEF001647. The Master Servicer is also required to "enforce the obligations of the Servicer under the Servicing Agreement," and "shall…terminate the rights and obligations of the Servicer…and act as successor Servicer of the related Mortgage Loans or cause the Trustee to enter in a new Servicing Agreement with a successor Servicer selected by the Master Servicer." PSA § 3.02(b), TAMBURRI DEF001647. The Master Servicer bears the costs of such enforcement. *Id.*

62.   Additionally, Wells Fargo as Master Servicer must make advances to the STARM Trust for the purposes of paying taxes and assessments to the extent SunTrust does not. *Id.* at TAMBURRI DEF001647. These advances are reimbursable (albeit without interest). *Id.* As Master Servicer, however, Wells Fargo's advancing responsibility is really servicing as a financial backstop for SunTrust.

63.   Wells Fargo's compensation as Master Servicer was all investment earnings on amounts in the "Collection Account." PSA § 3.19, TAMBURRI DEF001659; Hyle Deposition Rough Transcript Vol. 2 at 36. This "float" amounts to minimal income because funds are in the Collection Account for only around a week every month and because the funds must be invested in extremely conservative investments. PSA § 3.07(c), TAMBURRI DEF001652.

64.   To wit, all payments collected on the mortgage loans, minus SunTrust's servicing fee, are deposited in the servicer's Protected Account. PSA § 3.06, TAMBURRI DEF001651; Hyle Deposition Rough Transcript Vol. 2 at 35-36. On the Servicer

13

Remittance Date (the 18th of the month or the Business Day preceding the 18th if the 18th is not a Business Day), the funds in the Protected Account are transferred to the Collection Account.  PSA §§ 3.06, 3.07 TAMBURRI DEF001650-51.  The funds remain in the Collection Account until the Business Day before the 25th of the month when they are transferred to the Distribution Account.  From the Distribution Account the funds are disbursed to the Depositary Trust Company for distribution to the certificateholders. Hyle Deposition Rough Transcript Vol. 2 at 59.  This means that funds are in the Collection Account for only around a week every month.  Thus, Wells Fargo as Master Servicer receives minimal compensation.

65.     A precise calculation would require knowing the amount of the monthly remittances to the Collection Account and the investment returns received by Wells Fargo, *see* Hyle Deposition Rough Transcript Vol. 2 at 35-36.  Nonetheless, it is possible to get a ballpark number for Wells Fargo's compensation for the entire STARM Trust knowing that the initial principal balance of the mortgages in the STARM Trust was approximately $725 million, that the initial weighted interest rate was approximately 5.7% and that SunTrust's servicing fee was .375%.  TAMBURRI DEF001569; TAMBURRI DEF001595; Hyle Deposition Rough Transcript Vol. 2 at 31.  Using these numbers, there should be monthly remittances from the Protected Account of approximately $3.22 million:

$$= \frac{\$725,000,000 * (.05 - .00375)}{12}$$

If Wells Fargo invested this sum in securities returning 3% annually (perhaps a heroic assumption), it would have an annual return of $96,500.  But this assumes that Wells Fargo would be investing for 52 weeks every year.  In fact, it would only be investing for 12 weeks a year.  This income would amount to only about $22,000 annually.  If the investment yield was 1% annually, Wells Fargo would be receiving only around $7,000 annually for serving as Master Servicer.  (N.B. that I am not adjusting for present values, as the precise figures here are not what is important, but rather than illustrative of magnitudes).

66.     This Master Servicing Compensation of something in the range of $7,000-$22,000 annually is Wells Fargo's only compensation under the PSA for its role as Master Servicer for the entire STARM Trust.[8]  Wells Fargo's compensation does not receive additional compensation for more vigorous monitoring and supervision of SunTrust, including of SunTrust's actions in the foreclosure process.  Simply put, Wells Fargo is not compensated enough to care about getting it right, and its compensation is not reduced if a foreclosure is done incorrectly, as occurred twice (and possibly now a third time) in the case of Ms. Tamburri.  Wells Fargo's remuneration basically ensures that it will not exercise meaningful supervision over SunTrust in the case of

---

[8] Wells Fargo wears a second hat in the Securitization as the Trust Administrator.  This is a wholly ministerial role, with the Trust Administrator being responsible for providing certificate holders with reporting on the performance of the loans in the STARM Mortgage Loan Trust 2007-2 and making payments to the Depositary Trust Company for disbursement to the certificate holders.  PSA §§ 3.10(b), 4.02, 4.04, TAMBURRI DEF001654, DEF001663, DEF001672.  For these functions, Wells Fargo receives all earnings on amounts in the Distribution Account.  PSA § 9.05, TAMBURRI DEF001699.  As funds remain in the Distribution Account for only a single day each month, this amounts to another twelve days of float income a year.

any individual mortgage loan out of the thousands in the STARM Trust. While in theory, if Wells Fargo failed to perform its contractual duties under the PSA it could be removed by US Bank, the trustee, US Bank is under no duty to supervise Wells Fargo and is not compensated sufficiently for it to do so. *See infra* ¶¶ 67-69.

*US Bank*

67.      US Bank serves as the trustee for the STARM Trust. This is a distinct trusteeship than that of the DOT trustee for the Tamburri mortgage. US Bank is trustee for a securitized pool of thousands of mortgages on properties located nationwide, whereas the DOT trustee is trustee for a deed of trust on a single Contra Costa County property.

68.      By its own admission, US Bank's duties as trustee for the STARM Trust are "nominal." Robillard Deposition Rough Transcript at 40. *See also* Robillard Deposition Rough Transcript at 130. US Bank is serving as a corporate trustee with contractually delimited duties.[9] Instead, most of the administration of trust is handled by Wells Fargo as Trust Administrator. US Bank basically rents out its name as trustee for the trust, but has few duties until and unless there is an Event of Default (also known as a Master Servicer Event of Termination) under section 7.01 of the Pooling and Servicing Agreement. Events of Default include failure of the Master Servicer to perform any material covenants and agreements in the PSA, which would presumably include failure to fulfill its duty to supervise the servicer. PSA § 7.01(ii), TAMBURRI DEF001685. Prior to an Event of Default, US Bank is not obligated to undertake any particular action, PSA § 8.01, TAMBURRI DEF001688-1689, and US Bank is not deemed to have knowledge of an Event of Default unless notified. PSA § 8.02(viii), TAMBURRI DEF001691. Moreover, US Bank has little authority over Wells Fargo prior to an Event of Default, particularly in regard to the daily administration of the mortgage loans.

69.      US Bank's major role other than being a legal placeholder is to act as a financial guarantor of the transaction—in the event that Wells Fargo as Master Servicer were unable to perform its duties, US Bank would be required to step in for Wells Fargo or find a replacement Master Servicer and Trust Administrator. For this minimal role, US Bank receives an annual fee of $3,500 ($291/month) for serving as trustee. Robillard Deposition Rough Transcript at 75. Given this minimal compensation, it is not surprising that the US Bank account manager for the STARM Trust spends less than an hour a week on the trust. Robillard Deposition Rough Transcript at 22.

70.      Thus the PSA sets up a situation in which US Bank is supposed to supervise Wells Fargo, which is in turn supposed to supervise SunTrust. Yet, US Bank is not compensated sufficiently (or subject to sufficient liability to certificateholders) for it to undertake any meaningful supervision of Wells Fargo, and Wells Fargo, in turn, is not compensated sufficiently for it to undertake meaningful supervision of SunTrust. The result is almost guaranteed problems in default servicing because SunTrust is not incentivized to take care to properly service defaulted loans like Ms. Tamburri's.

---

[9] I express no opinion here as to whether US Bank as trustee nonetheless has fiduciary or other non-contractual duties, but note that this is a matter of some contention in other litigation.

*ReconTrust*

71.     The final Defendant whose role requires some discussion is ReconTrust. ReconTrust is a national bank subsidiary of Bank of America, N.A. ReconTrust's role in this case was as alleged substitute trustee under the Tamburri DOT. (As discussed below in ¶¶ 82-88, ReconTrust was not properly appointed as substitute trustee.) As substitute trustee, ReconTrust would have been in charge of exercising the power of sale under the DOT, which means handling the foreclosure sale mechanics, starting with the notice of default.

72.     To understand how the layers of improper assignments and substitutions piled up, it is necessary to recognize that no party in the chain of supervision—ReconTrust acting at the direction MERS, which was acting at the direction of SunTrust, which was supervised by Wells Fargo, which was in turn supervised by US Bank—was incentivized, however, to get things right. Instead, all of the Defendants' were incentivized to take minimal care regarding the servicing of the Tamburri mortgage.

73.     ReconTrust is compensated on a per-service basis for conducting a nonjudicial foreclosure, but ReconTrust's compensation depends on it meeting certain timelines. Pressure to meet these timelines appears to have been a major problem at ReconTrust; Ms. Tina Sevillano, the individual that signed the substitution of trustee and assignment of deed of trust that purported to make ReconTrust the substitute trustee and US Bank the DOT beneficiary, was terminated by ReconTrust for failure to meet document production timelines. Valerio Deposition Rough Transcript at 57-61.

74.     ReconTrust is compensated based on the work it actually completes. Valerio Deposition Rough Transcript at 143. ReconTrust's compensation, however, depends on it meeting various timetables known as milestones. *See* Valerio Deposition Rough Transcript at 123. These milestones exist because SunTrust's compensation depends on ReconTrust performing the nonjudicial foreclosure in a timely fashion.

75.     SunTrust is required to conduct its "in strict compliance with the servicing provisions of the [Fannie Mae Sellers'] and [Freddie Mac Servicers'] Guides (special servicing option, which include, but are not limited to, provisions regarding the liquidation of Mortgage Loans; the collection of Mortgage loan payments..." PSWA § 4.01, TAMBURRI DEF001524. The Fannie Mae Sellers' Guide and the Freddie Mac Servicers' Guide contain timetable for foreclosures that vary by state. Servicers that fail to meet the timetables have their compensation docked.

76.     Critically, ReconTrust's compensation appears to be driven by making various filings in a timely fashion, rather than by getting those filings right. A team of five people might have to process 600 loan files in a day. For an eight-hour day, that is a loan file ever four minutes. Valerio Deposition Rough Transcript at 62-63. This compensation structure may explain the failure of internal supervision at ReconTrust in regard to the Tamburri foreclosure. ReconTrust's functions in relation to the Tamburri foreclosure were supervised at the time by an Assistant Vice President, Ms. Flor D. Valerio, whom ReconTrust designated as its deponent under Federal Rule of Civil Procedure 30(b)(6). Valerio Deposition Rough Transcript at 3. Ms. Valerio was the supervisor in charge of ReconTrust's Trustee Services Group in its Simi Valley office. Valerio Deposition Rough Transcript at 28-30.

77.  Ms. Valerio's education consists of a high school degree from Sun Valley Polytechnic High School.  Valerio Deposition Rough Transcript at 71.  She has no specific education in banking or mortgage servicing.  Id.  Prior to her employment at ReconTrust, she worked for a nonprofit for subsidized child care.  Valerio Deposition Rough Transcript at 72.  For a decade before that, she worked at various firms doing foreclosure document related work.  Valerio Deposition Rough Transcript at 73-76.

78.  As a ReconTrust Assistant Vice President earning no more than $70,000 annually, Valerio Deposition Rough Transcript at 93, Ms. Valerio wore an amazing number of hats simultaneously that had her supervising a large range ReconTrust's operations, including:

  • the "Open Unit," which "receives all the new referrals from Bank of America";

  • the "New Order Unit," which "conducts an audit and prepares any documents needed for the loan";

  • the "Review Team," which "receives the trustee sale guarantees, reviews it, and enters the information into our system of record";

  • the "Second Audit Team," which "comes in after and completes a review or an audit of the Review Team's process";

  • the "Notary Team," which "notarizes all the documents within the Simi Valley office for all units within ReconTrust";

  • the "Aftersale Team," which is "responsible for delivering clear title to HUD and VA"

  • the "Communication Team"

  • liaison for ReconTrust's "offshore associates in the Philippines, India, and Costa Rica."

Valerio Deposition Rough Transcript at 12-15. For all of these various functions, Ms. Valerio manages numerous teams of 5-9 employees dealing with defaults and foreclosures.  Valerio Deposition Rough Transcript at 45, 62, 63.  These teams included both salaried employees such as Ms. Sevillano and contract employees, such as Mr. Ahmad Afzal, the notary who notarized the Substitution of Trustee and Assignment of Deed of Trust for the Tamburri mortgage that was recorded on Jun 21, 2010.  While ReconTrust does have various internal controls and regulatory supervision, it does not undertake any steps to ensure that documents are not backdated.  Valerio Deposition Rough Transcript at 120-122.   ReconTrust audits its notaries by job shadowing, rather than inspecting existing journal entries.  Id.  In these circumstances where there was no meaningful supervision and controls over the foreclosure paperwork process, improper foreclosures were repeatedly filed against Ms. Tamburri.  The following section details the problems in the attempted foreclosures.

## IV. THE NOTICES OF DEFAULT, SUBSTITUTIONS OF TRUSTEE, AND ASSIGNMENTS OF BENEFICIAL INTEREST IN THE TAMBURRI DEED OF TRUST

79.     Two separate notices of default were filed regarding the Tamburri mortgage. The first, filed on April 21, 2009 by MTC Financial, Inc., d/b/a Trustee Corps, listed Trustee Corps as the DOT trustee and MERS as the DOT beneficiary. No substitution of trustee of Trustee Corps for Jackie Miller was recorded until October 22, 2009 (and dated July 8, 2009). This substitution of trustee listed SunTrust as the DOT beneficiary. However, it appears that SunTrust was never the beneficiary under the DOT. Instead, MERS was the initial DOT beneficiary, and SunTrust was the Lender under the DOT. This arrangement benefitted MERS and SunTrust by helping avoid county recordation fees for each transfer in the securitization.

80.     The second notice of default was filed by ReconTrust on June 9, 2010. ReconTrust was not recorded as substitute trustee for Trustee Corps until June 21, 2010. The substitution of trustee is dated June 8, but notarized on June 10, and is allegedly backdated. Complaint, ¶¶ 61-62. The same document purports to transfer the beneficial interest in the DOT from MERS to US Bank. The alleged signor of this document, a Ms. Tina Sevillano, is alleged not to have had authority to sign the substitution of trustee, thereby vitiating the transfer of DOT beneficiary status from MERS to US Bank. Complaint, ¶¶ 61-62.

81.     Specifically, Ms. Sevillano had authority to sign documents as a MERS certifying officer, but she her June 2010 authorization of the substitution of trustee from MERS to ReconTrust and her assignment of the beneficiary status for the Tamburri DOT went beyond the scope of her authority in three ways.

82.     First, and most fundamentally, only SunTrust had a right to appoint a substitute trustee, and the appointment had to be done through a certain process. The creation of the deed of trust trusteeship comes from a contract—the deed of trust—rather than from statute. Therefore, the process for appointing a substitute trustee is also circumscribed by the deed of trust. Pursuant to paragraph 24 of the Tamburri DOT (a standard instrument used nationwide), only the "Lender" can appoint a substitute trustee:

> **24. Substitute Trustee.** Lender, at its option, may from time to time appoint a successor trustee to any Trustee appointed hereunder by an instrument executed and acknowledged by Lender and recorded in the office of the Record of the county in which the Property is located. The instrument shall contain the name of the original Lender, Trustee, and Borrower, the book and page where this Security Instrument is recorded and the name and address of the successor trustee....This procedure for substitution of trustee shall govern to the exclusion of all other provisions for substitution.

The DOT defines "Lender" as SunTrust. MERS is defined in the DOT as the "Deed of Trust Beneficiary." Thus, ReconTrust's engagement as substitute trustee would have to have been at the direction of the Lender SunTrust, rather than the direction of the DOT beneficiary MERS. SunTrust never appointed ReconTrust or MERS as substitute trustee, at least prior to June 2010.

18

83. Thus, it is not clear how ReconTrust claims *any* authority vis-à-vis the Tamburri mortgage at least through June 2010.[10]

84. Moreover, the June 2010 substitution of trustee does not comply with paragraph 24 of the Tamburri DOT, which is the exclusive provision for substitution of a trustee, because it does not contain the name of the "original Lender". SunTrust's name is nowhere to be found on the June 2010 substitution of trustee. In short, the June 2010 substitution of trustee does not comply with the Tamburri DOT and is invalid for that reason.

85. Second, even if MERS could have properly recorded a substitution of trustee, Ms. Sevillano lacked authority to sign for MERS in this instance. Ms. Sevillano's authority to sign documents for MERS came from a MERS corporate resolution that made her a MERS certifying officer. *See Valerio Deposition Rough Transcript at 46.* This MERS corporate resolution authorized Ms. Sevillano to:

> (2) assign the lien of any mortgage loan naming MERS as the mortgagee *when the Member is also the current promissory note-holder*, or if the mortgage loan is registered on the MERS System, *is shown to be registered to the Member*; (3) execute any and all documents necessary to foreclose upon the property securing any mortgage loan registered on the MERS System that *is shown to be registered to the Member,* including, but not limited to (a) substitution of trustee on Deeds of Trust…

MERS Corporate Resolution, TAMBURRI DEF000475 (emphasis added).

86. The MERS corporate resolution did not define the capitalized term "Member," but from context, the term "Member" could refer only to "BAC Home Loan Servicing, LP, a member of the Mortgage Electronic Registration Systems, Inc. (MERS)". *Id.* This is clear in light of other parts of the MERS corporate resolution that use the term "Member," including an authorization for Ms. Sevillano and other ReconTrust employees to "release the lien of any mortgage loan registered on the MERS System that is shown to be registered to the Member." *Id.* ReconTrust is not a MERS member. BAC Home Loan Servicing, LP, however, is a MERS member and is the mortgage servicing affiliate of ReconTrust. If Member referred to anything other than BAC Home Loan Servicing, LP, Ms. Sevillano and a host of other ReconTrust employees would be empowered to release the liens on roughly two-thirds of the mortgages in the United States without having any relationship whatsoever to the parties whose loans are secured by those liens. Thus, Ms. Sevillano's authorization to sign documents in MERS' name, including substitutions of trustee and assignments of DOT beneficiary status is limited to those mortgage loans registered to BAC Home

---

[10] On October 22, 2009, a substitution of trustee from Jackie Miller to Trustee Corps was recorded, claiming, incorrectly, that SunTrust was the DOT beneficiary. This substitution, however, was at least signed by SunTrust. The June 2010 substitution of trustee simply stated that MERS as DOT was substituting ReconTrust for Jackie Miller as trustee and was signed by ReconTrust employee Tina Sevillano on behalf of MERS. MERS, however, had no authority to appoint a substitute trustee, and to the extent that the October 22, 2009 substitution of trustee was valid, Jackie Miller was no longer the trustee, but instead Trustee Corps was, as nothing in the record indicates that the October 22, 2009 substitution of trustee was ever withdrawn, so the June 2010 substitution of trustee would be incorrect for failing to identify the out-going trustee.

Loan Servicing, LP. Ms. Sevillano never had any authority to sign an assignment of a DOT beneficiary status registered to SunTrust, Trustee Corps, UBS, the STARM Trust or US Bank, any more than she had the authority to sell the Golden Gate Bridge. Valerio Deposition Rough Transcript at 48-49.

87. Third, even if Tina Sevillano had authority to sign for MERS, however, it is not clear that MERS had any authority to assign the beneficial interest in the Tamburri DOT. MERS serves as a common agent for its members, but not all of the parties in the securitization of the Tamburri mortgage are MERS members. MERS' membership can be searched on the MERS website. http://www.mersinc.org/about-us/member-search. MAST is not—and does not appear to have ever been—a member of MERS. Only SunTrust, UBS, and US Bank are MERS members. MERS' authority to act is limited by the scope of its agency, and MERS has no agency with MAST. Thus, once the note was transferred to MAST, the beneficial interest in the deed of trust was equitably MAST's, even if it remained recorded in MERS' name. *See* CAL. CIV. CODE § 2936 (providing that a transfer of the note effectuates a transfer of the security instrument). Absent authorization from MAST, MERS had no authority to *ever* transfer the beneficial interest in the Tamburri DOT to US Bank.

88. Thus, ReconTrust lacked authority to record the substitution of trustee and the transfer of the DOT beneficiary status. Moreover, even if ReconTrust had such authority, the recordation of the substitution of trustee and assignment of DOT beneficiary status was undertaken *after* the June 9, 2010 notice of default, so the June 9, 2010 notice of default was materially false when filed because it appeared that ReconTrust was recording the notice of default on behalf of US Bank because the notice instructed the Plaintiff to contact US Bank about how she could avoid foreclosure. Notice of Default, Doc-2010-0114981-00, recorded June 9, 2010.

89. Even if ReconTrust was properly substituted as trustee, there would still be a problem with the attempted foreclosure on Ms. Tamburri's mortgage because the foreclosure was commenced with a notice of default filed by ReconTrust on June 9, 2010, that appeared to state that US Bank was the DOT beneficiary, when in fact US Bank was not the DOT beneficiary of record until June 21, 2010.[11] Thus, at the very least, ReconTrust jumped the gun on filing the notice of default listing US Bank as the DOT beneficiary, and quite possibly US Bank was *never* properly the DOT beneficiary either because MERS lacked authority to act on behalf of MAST or Tina Sevillano lacked authority to act on behalf of MERS.

90. Once securitized, a large cast of financial institutions was in some way involved in Ms. Tamburri's mortgage. What resulted was a diffusion of responsibility, which when coupled with compensation structures that incentivized doing things cheaply, rather than getting them right, resulted in repeated improper foreclosure filings. ReconTrust acted at the direction MERS, which was acting at the direction of SunTrust, which was supervised by Wells Fargo, which was in turn supervised by US Bank. Every party involved appears to have looked the other way or passed the buck,

---

[11] ReconTrust's authority to file the notice of default on June 9, 2010 is itself questionable, as ReconTrust was not recorded as substitute trustee until June 21, 2010. Prior to being appointed as substitute trustee, it is unclear on what basis—if any—ReconTrust had authority to file a notice of default.

hiding behind poorly trained, poorly supervised, and poorly compensated employees. Defendants' behavior toward Ms. Tamburri, however, was not merely a matter of negligence and incompetence. Instead, it was part and parcel of an enterprise built around willful disregard for due process and legal compliance because they are costly to Defendants.

91.   It is hard to adequately describe behavior of the Defendants in regard to the Tamburri mortgage without resorting to the acronyms of fubar and snafu. The only thing that reduces the jaw-dropping nature of the incompetence and callousness displayed by Defendants regarding the Tamburri mortgage is that Ms. Tamburri's experience is par for the course for homeowners in California and across the nation. The failure to comply with legal requirements regarding the transfer, recording, and foreclosure of real property is endemic in the mortgage servicing industry.

**Conclusion**

92.   I reserve the right to amend and supplement this report and to submit a rebuttal report.

93.   Under the pain and penalty of perjury, I declare the foregoing to all be correct and true to the best of my knowledge.


EXECUTED on the _15_ th day of May, 2013, in Los Angeles, California.

21

**APPENDIX A.**

**Curriculum Vitae of**

**Adam J. Levitin**

**(including complete list of publications)**

# ADAM J. LEVITIN

600 New Jersey Ave., NW
Hotung 6022
Washington, DC 20001
(202) 662-9234
adam.levitin@law.georgetown.edu

## LEGAL EMPLOYMENT & APPOINTMENTS

| | |
|---|---|
| **HARVARD LAW SCHOOL**<br>*Bruce W. Nichols Visiting Professor of Law* | 2012-2013 |
| **GEORGETOWN UNIVERSITY LAW CENTER**<br>*Professor of Law (2011-present)*<br>*Associate Professor of Law (2007-2011)* | 2007-present |
| **CONSUMER FINANCIAL PROTECTION BUREAU, CONSUMER ADVISORY BOARD**<br>*Chair, Mortgage Subcommittee* | 2012-2014 |
| **CONGRESSIONAL OVERSIGHT PANEL FOR TROUBLED ASSET RELIEF PROGRAM**<br>*Special Counsel* | Nov. 2008-Dec. 2010 |
| **AMERICAN BANKRUPTCY INSTITUTE**<br>*Robert Zinman Scholar in Residence* | Fall 2009 |
| **FEDERAL TRADE COMMISSION**<br>*Faculty, Division of Financial Practices Academy* | Summer 2008 |
| **WEIL, GOTSHAL & MANGES LLP**, New York, New York<br>*Associate, Business Finance & Restructuring Department* | 2006-2007 |
| **HON. JANE R. ROTH, THIRD CIRCUIT COURT OF APPEALS**, Wilmington, Delaware<br>*Judicial Clerk* | 2005-2006 |

## EDUCATION

**HARVARD LAW SCHOOL**, J.D., *cum laude,* 2005
– Notes Chair, *Harvard Journal on Legislation*

**COLUMBIA UNIVERSITY**, M.PHIL. IN HISTORY, 2001, A.M. IN HISTORY, 2000
– Mellon Fellowship in Humanistic Studies
– President's Fellow of the University
– Richard Hofstader Fellow of the Faculty in History

**HARVARD COLLEGE**, A.B. IN NEAR EASTERN LANGUAGES & CIVILIZATIONS AND HISTORY, *magna cum laude with highest honors in field*, 1998
– Thomas Temple Hoopes Prize for Outstanding Senior Honors Thesis

## LEGAL PUBLICATIONS

**Articles**

- *Bankruptcy Law and the Cost of Credit:  The Impact of Cramdown on Mortgage Interest Rates* (with Joshua Goodman) (in submission)

- *Duties to Serve After the Fall:  Rethinking Community Reinvestment and Housing Goals*, Harvard Joint Center of Housing working paper, 2013 (with Janneke Ratcliffe)

- *The Paper Chase:   Securitization, Foreclosure, and the Uncertainty of Mortgage Title,* 63 DUKE L.J. (forthcoming 2013)

- *A Transactional Genealogy of Scandal from Michael Milken to Enron to Goldman Sachs,* 86 S. CAL. L. REV. (forthcoming 2013) (with William Bratton)

- *The Commercial Real Estate Bubble,* 2 HARV. BUS. L. REV. (forthcoming 2013) (with Susan Wachter)

- *The Public Option in Housing Finance,* 46 U.C. DAVIS L. REV. 1111 (2013) (with Susan Wachter)

- *Skin-in-the-Game:  Risk Retention Lessons from Credit Card Securitization,* 81 GEO. WASH. L. REV.  813 (2013)

- *The Tenuous Case for Derivatives Clearinghouses,* 101 GEO. L.J. 445 (2013)

- *Why Housing?* 23 HOUSING POL'Y DEBATE 5 (2013) (with Susan Wachter) (peer reviewed)

- *Bankrupt Politics and the Politics of Bankruptcy,* 97 CORNELL L. REV. 100 (2012)

- *Explaining the Housing Bubble,* 100 GEO. L.J. 1177 (2012) (with Susan Wachter)
    --Discussed in THE ECONOMIST ("Bricks and Slaughter," Mar. 3, 2011)

- *The Dodd-Frank Act and Housing Finance:  Can It Restore Private Risk-Capital to the Securitization Market?* 29 YALE J. ON REG. 101 (2012) (symposium volume) (with Andrey D. Pavlov & Susan M. Wachter)

- *Rate Jacking: Risk-Based and Opportunistic Pricing in Credit Cards,* 2011 UTAH L. REV. 339 (2011) (invited theme issue on the Credit C.A.R.D. Act)

- *Private Disordering? Payment Card Fraud Liability Rules,* 5 BROOKLYN J. OF CORP., FIN. & COMM. LAW 1 (2011) (symposium issue)

- *Mortgage Servicing,* 28 YALE J. ON REG. 1 (2011) (with Tara Twomey)

- *In Defense of Bailouts,* 99 GEO. L.J. 435 (2011)
    --Winner, 2011 C-LEAF Junior Faculty Scholarship Prize

- *Rewriting Frankenstein Contracts:  The Workout Prohibition in Residential Mortgage Backed Securities,* 82 S. CAL. L. REV. 1075 (2010) (with Anna Gelpern)
    --Accepted for the 2009 Stanford-Yale Junior Faculty Forum

- *Bankruptcy Markets:  Making Sense of Claims Trading,* 4 BROOKLYN J. OF CORP., FIN. & COMM. LAW 64 (2010) (symposium issue)

- *Resolving the Foreclosure Crisis:  Modification of Mortgages in Bankruptcy,* 2009 WISC. L. REV. 565 (2009)
    --Accepted for the American Law and Economics Association Annual Convention
    --Accepted for Third Annual Conference on Empirical Legal Studies
    --Accepted for Harvard-Texas Conference on Commercial Realities

- *Hydraulic Regulation:  Regulating Credit Markets Upstream,* 26 YALE J. ON REG. 143 (2009)
    --Winner, Walton H. Hamilton Prize for Outstanding Scholarship, Yale Journal on Regulation
    --Accepted for University of Connecticut Workshop on Banking and Consumer Financial Services Law

- *Priceless?  The Costs of Credit Cards,* 55 UCLA L. REV. 1321 (2008)
    --Winner, American College of Consumer Financial Services Lawyers Annual Writing Competition

- *Priceless?  The Social Costs of Credit Card Merchant Restraints,* 45 HARV. J. ON LEGIS. 1 (2008)

- *Payment Wars:  The Merchant-Bank Struggle for Control of Consumer Payment Systems*, 12 STAN. J. L., BUS. & FIN. 425 (2007)

- *Finding Nemo:  Rediscovering the Virtues of Negotiability in the Wake of Enron*, 2007 COLUM. BUS. L. REV. 83 (2007)

- *Toward a Federal Common Law of Bankruptcy: Judicial Lawmaking in a Statutory Regime*, 80 AM. BANKR. L.J. 1 (2006) (double-blind peer-reviewed journal, published by National Conference of Bankruptcy Judges) –winner of American Bankruptcy Law Journal's 2007 Editors' Prize

- *The Limits of Enron:  Counterparty Risk in Bankruptcy Claims Trading*, 15 J. BANKR. L. & PRAC. 389 (2006) (peer-reviewed journal)

- *The Merchant-Bank Struggle for Control of Payment Systems*, 17 J. FIN. TRANSFORMATION 73 (2006) (peer-reviewed applied finance journal)

- *The Antitrust Super Bowl:  America's Payment Systems, No-Surcharge Rules, and the Hidden Costs of Credit*, 3 BERKELEY BUS. L.J. 265 (2005)

## Book Chapters

- *Electronic Transfers from the Consumer's Account*, in CONSUMER BANKING AND PAYMENTS LAW (Nat'l Consumer Law Center, 5th ed. 2013)

- *Deregulation and the Financial Crisis of 2008*, in REGULATORY BREAKDOWN? THE CRISIS OF CONFIDENCE IN U.S. REGULATION, Cary Coglianese, ed. (University of Pennsylvania Press 2012) (with Susan M. Wachter)

- *Fiscal Federalism and the Limits of Bankruptcy*, in WHEN STATES GO BROKE: ORIGINS, CONTEXT, AND SOLUTIONS FOR THE AMERICAN STATES IN FISCAL CRISIS, Peter Conti-Brown, ed. (Cambridge University Press 2011)

- *Information Asymmetries in the U.S. Mortgage Crisis*, in THE AMERICAN MORTGAGE SYSTEM: RETHINK, RECOVER, REBUILD, Susan M. Wachter & Martin M. Smith, eds. (University of Pennsylvania Press 2011) (with Susan M. Wachter)

- *Modification of Mortgages in Bankruptcy*, LESSONS FROM THE FINANCIAL CRISIS: INSIGHTS AND ANALYSIS FROM TODAY'S LEADING MINDS, Richard W. Kolb, ed. (Wiley 2009)

## Shorter Articles and Research Papers

- *An Analysis of the Proposed Interchange Fee Litigation Settlement*, at http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2133361

- *Clearing the Mortgage Market Through Principal Reduction:  A Bad Bank for Housing (RTC 2.0)*, Pew Charitable Trusts Strategies to Improve the Housing Market Research Paper (2012), *available at* http://www.pewstates.org/uploadedFiles/PCS_Assets/2012/Clearing_the_Mortgage_Market.pdf.

- *What Next for Housing Finance?* 15 WHARTON REAL ESTATE REV. (forthcoming 2012) (with Susan Wachter)

- *Cross-Routing:  PIN and Signature Debit Interchangeability Under the Durbin Amendment*, 2 LYDIAN J.16 (Dec. 2010)

- *Interchange Regulation:  Implications for Credit Unions*, Research Brief #224, The Filene Research Institute, November 2010

- *Back to the Future with Chapter 13:  A Reply to Professor Scarberry*, 37 PEPPERDINE L. REV. 1261 (2010).

- *Overdraft Regulation:  A Silver Lining to the Regulatory Clouds?*, Research Brief #211, The Filene Research Institute, April 2010

- *The Credit C.A.R.D. Act:  Opportunities and Challenges for Credit Unions*, Research Brief #202, The Filene Research Institute, Dec. 2009

- *Critique of Evans and Wright's Study of the Consumer Financial Protection Agency Act*, white paper, Oct. 22, 2009, *available at* http://ssrn.com/abstract=1492471

- *Bad and Good Securitization*, 13 WHARTON REAL ESTATE REV. 23 (2010) (with Andrey Pavlov and Susan Wachter), *available at* http://papers.ssrn.com/abstract=1462895
- *The Consumer Financial Protection Agency*, Policy Analysis, Pew Charitable Trusts Financial Reform Project, Research Brief #2, July 2009
  - The "best one-stop paper for understanding why CFPA needs to pass." Baseline Scenario, *at* http://baselinescenario.com/2009/08/17/a-cfpa-research-brief/
- *The Crisis Without a Face: Emerging Narratives of the Financial Crisis*, 63 U. MIAMI L. REV. 999 (2009) (invited foreword to themed volume)
- *Remote Deposit Capture: A Legal and Transactional Overview*, 126 BANKING L.J. 115 (2009) (peer-edited journal)
- *Helping Homeowners: Modification of Mortgages in Bankruptcy,* 3 HARV. L. & POL'Y REV. (online) (Jan. 19, 2009) (invited contribution), *at* http://www.hlpronline.com/Levitin_HLPR_011909.pdf
- *Reforming Mortgage* Servicing, Research Brief, American Association of Retired Persons, Dec. 2008
- *All But Accurate: A Critique of the American Bankers Association Study on Credit Card Regulation*, white paper, December 6, 2007, *at* http://papers.ssrn.com/abstract=900444
- *Gifting Plans and Absolute Priority*, 124 BANKING L.J. 722 (2007) (peer-edited journal)
- *The Problematic Case for Incentive Compensation in Bankruptcy*, 155 UNIV. PA. L. REV. PENNUMBRA 88 (2007)
- *Health Care Privacy Issues in Corporate Reorganizations*, Materials Presented Before the American Bankruptcy Institute 2007 New York City Bankruptcy Conference, May 7, 2007 (co-authored with Arthur R. Cormier & Andrew M. Troop)

**Encyclopedia Entries**

- *Mortgage Market Character and Trends: USA*, in THE HOUSING ENCYCLOPEDIA, Susan Smith, ed., (Cambridge University Press 2012) (with Susan Wachter)
- *American Mortgages,* in THE HOUSING ENCYCLOPEDIA, Susan Smith, ed., (Cambridge University Press 2012) (with Susan Wachter)

## LEGAL SCHOLARSHIP AWARDS AND GRANTS

- American Law Institute, Young Scholar's Medal, 2013
- Pew Charitable Trusts, Grant for Strategies for Reviving the Housing Market, 2012
- George Washington University, Center for Law, Economics & Finance, Junior Faculty Scholarship Prize, 2011
- Walton H. Hamilton Prize for Outstanding Scholarship, Yale Journal on Regulation, 2009
- Best Professional Article, American College of Consumer Financial Services Lawyers Annual Writing Competition, 2009
- American Bankruptcy Law Journal's 2007 Editors' Prize

## LEGISLATIVE TESTIMONY AND BRIEFINGS

- Testimony Before the House Judiciary Committee, Subcommittee on Intellectual Property, Competition, and the Internet, July 10, 2012 ("The Dodd-Frank Act's Effects on Financial Services Competition")
- Testimony Before the House Financial Services Committee, Subcommittee on Capital Markets and Government Sponsored Institutions, June 7, 2012 ("Investor Protection: The Need to Protect Investors from Government")

- Testimony Before the House Financial Services Committee, Subcommittee on Financial Institutions and Consumer Credit, May 9, 2012 ("Rising Regulatory Compliance Costs and Their Impact on the Health of Small Financial Institutions")
- Testimony Before the House Financial Services Committee, Subcommittee on Financial Institutions and Consumer Credit & Subcommittee on Capital Markets and Government Sponsored Enterprises, Nov. 16, 2011 (Joint Hearing on "H.R. 1697: The Communities First Act")
- Testimony Before the Senate Committee on Banking, Housing, and Urban Affairs, Sept. 13, 2011 ("Housing Finance Reform: Should There Be a Government Guarantee?").
- Testimony Submitted to the House Committee on the Judiciary, Sept. 8, 2011 (H.R. 2533, the "Chapter 11 Bankruptcy Venue Reform Act of 2011").
- Testimony Before the House Committee on Small Business, Subcommittee on Oversight, Investigations & Regulation, July 28, 2011 ("Open for Business: The Impact of the CFPB on Small Business").
- Testimony Before the Senate Committee on Banking, Housing, and Urban Affairs, July 19, 2011 ("Enhanced Consumer Financial Protection After the Financial Crisis").
- Testimony Before the House Government Oversight and Reform Committee, Subcommittee on TARP, Financial Institutions, and Bailouts of Public and Private Institutions, May 24, 2011 ("Who's Watching the Watchmen? Oversight of the Consumer Financial Protection Bureau").
- Testimony Before the House Financial Services Committee, Subcommittee on Financial Institutions and Consumer Credit, Apr. 6, 2011 ("Legislative Proposals to Improve the Structure of the Consumer Financial Protection Bureau").
- Testimony Before the House Financial Services Committee, Subcommittee on Housing and Community Opportunity, Nov. 18, 2010 ("Robo-Signing, Chain of Title, Loss Mitigation, and Other Issues in Mortgage Servicing").
- Testimony Before the Senate Committee on Banking, Housing, and Urban Affairs, Nov. 16, 2010 ("Problems in Mortgage Servicing from Modifications to Foreclosures").
- Testimony Before the Financial Crisis Inquiry Commission, Oct. 28, 2010, *at* http://fcic.law.stanford.edu/interviews/view/421.
- "Future of Housing Finance," Center for American Progress Mortgage Finance Working Group Presentation to the U.S. Department of Treasury, August 2, 2010.
- Testimony Before the House Judiciary Committee, Subcommittee on Commercial and Administrative Law, December 11, 2009 ("Home Foreclosures: Will Voluntary Mortgage Modification Help Families Save Their Homes? Part II?").
- Testimony Before the Senate Judiciary Committee, Subcommittee on Administrative Oversight and the Courts, July 23, 2009 ("The Worsening Foreclosure Crisis: Is It Time to Reconsider Bankruptcy Reform?").
- Testimony Before the House Judiciary Committee, Subcommittee on Commercial and Administrative Law, April 2, 2009 (re: Consumer Debt — Are Credit Cards Bankrupting Americans?).
- Testimony Before the Senate Judiciary Committee, Subcommittee on Administrative Oversight and the Courts, Mar. 24, 2009 ("Abusive Credit Card Practices and Bankruptcy," re: Consumer Credit Fairness Act, S.257).
- Testimony Before the Senate Committee on Banking, Housing and Urban Affairs, Feb. 12, 2009 (re: Modernizing Consumer Protection in the Financial Regulatory System: Strengthening Credit Card Protections).
- Testimony Before the House Judiciary Committee, Jan. 22, 2009 (re: Helping Families Save Their Homes in Bankruptcy Act, H.R. 220, and the Emergency Homeownership and Equity Protection Act, H.R. 225).
- Testimony Before the Senate Judiciary Committee, Nov. 19, 2008 (re: Helping Families Save Their Homes in Bankruptcy Act, now S.61).
- "Bankruptcy Modification of Mortgages," Democratic Staff Briefing, United States House of Representatives, November 14, 2008.

- Testimony Before the House Financial Services Committee, Subcommittee on Financial Institutions and Consumer Credit on March 13, 2008 (re: Credit Cardholders' Bill of Rights).
- Testimony Submitted to the Economic Matters Committee, Maryland State House of Delegates, March 6, 2008.
- "Credit Card Regulation," Democratic Staff Briefing, United States House of Representatives, March 5, 2008.

## EDITORIALS AND BLOGGING

- "Make the Banks Pay," SALON, Oct. 27, 2011.
- "Fed's Feeble Swipe Fee Rule Is an Unauthorized Sop to Big Banks," AMERICAN BANKER, July 8, 2011.
- "More Openness on Mortgages," N.Y. TIMES, Mar. 8, 2010.
- Letter to the Editor, WASHINGTON POST, July 6, 2010.
- Letter to the Editor, WASHINGTON TIMES, June 22, 2010.
- "Swipe Fee Reform Benefits Consumers and Businesses Large and Small," HUFFINGTON POST, June 18, 2010.
- "Rein in the Credit Card Games," DETROIT FREE-PRESS, Nov. 28, 2008 (reprinted as "Consumer Pay High Price for Credit Cards," SAN DIEGO UNION-TRIBUNE, Nov. 30, 2008) (reprinted as "Credit cards on Santa's naughty list," ATLANTA JOURNAL CONSTITUTION, Dec. 7, 2008).
- "Bailout Bill Must Include Help for Homeowners," WASHINGTON INDEPENDENT, Sept. 26, 2008.
- "The Card Industry Still Has a Chance to Reform," AMERICAN BANKER, Aug. 8, 2008.
- "The Flaws in the FHA Housing Bill", op-ed, WALL ST. JOURNAL, July 11, 2008.
- Letter to the Editor, WALL ST. JOURNAL, April 3, 2008.
- "Complex Pricing of Credit Cards Should be Simplified," op-ed, CHICAGO TRIBUNE, Dec. 27, 2007, at A21 (reprinted in THE BALTIMORE SUN)
- "Conglomerate Master" guest blogger on The Conglomerate, 2010-2011
- Guest blogger, PrawfsBlawg, May 2008
- Guest blogger, Warren Reports at TPM Café, Jan. 2007
- Blogger, Credit Slips, www.creditslips.org, Dec. 31, 2007-present

## PROFESSIONAL SERVICE AND ACTIVITIES

- Reporter, Advisory Committee on Multiple Debtor Cases, American Bankruptcy Institute Commission to Study the Reform of Chapter 11
- World Bank Insolvency and Debtor/Creditor Regime Task Force
- Fellow, Center for Law, Economics and Finance (C-LEAF) at George Washington University Law School
- Editorial Board, AMERICAN BANKRUPTCY INSTITUTE LAW REVIEW
- Center for American Progress, Mortgage Finance Working Group
- Manuscript reviewer for AMERICAN BANKRUPTCY LAW JOURNAL; Cambridge University Press; CITYSCAPE; Conference on Empirical Legal Studies; GEORGETOWN LAW JOURNAL; HOUSING POLICY DEBATE; JOURNAL OF EMPIRICAL LEGAL STUDIES; LAW & SOCIETY REVIEW; Netherlands Organization for Scientific Research; Oxford University Press; YALE LAW JOURNAL; Yale University Press
- Area Organizer for Bankruptcy, American Law and Economics Association (2009)
- Executive Committee Member, AALS Section on Financial Institutions & Consumer Financial Services (2009)
- United States Court of Appeals for the Third Circuit (2006)
- United States District Court for the Southern District of New York (2006)
- United States District Court for the Eastern District of New York (2006)
- New York State Courts (2006)

## APPENDIX B.

### List of Documents Consulted

- Second Amended Complaint
- Third Amended Complaint
- Deposition Transcript of John Hyle (02/27/13, Rough 05/10/13)
- Deposition Transcript of MTC Financial PMK (03/11/13)
- Deposition Transcript of Afzal Ahmad (04/10/13)
- Deposition Transcript of Tina Sevillano (04/10/13)
- Deposition Transcript of Corra Semmes Bryce (04/25/13)
- Rough Deposition Transcript of Flor Valerio  (04/26/13)
- Rough Deposition Transcript of Beverly Dumas (04/26/13)
- Rough Deposition Transcript of Tony Robillard (05/07/13)
- DEF0000001-0000156
- DEF0001564-0002016
- Order Granting in Part & Denying in Part Defendants' Motion to Dismiss (06/21/12)
- Discovery Order Grating Plaintiff the right to take depositions
- Order Extending Expert Discovery Cutoff (04/19/13)
- Freddie Mac Single Family Seller/Servicer Guide, Vol. 2
- MERS Member Search, http://www.mersinc.org/about-us/member-search
- Complaint, Delaware v. MERSCorp, Inc., No. 2011-10-27 (De. Ch. Ct., Oct. 27, 2011)
- Culhane v. Aurora Loan Servs., 826 F. Supp. 2d 352, 368 (D. Mass. 2011) (Young, J.)
- Adam J. Levitin & Tara Twomey, *Mortgage Servicing*, 28 YALE J. ON REG. 1 (2011)
- Adam J. Levitin & Anna Gelpern, *Rewriting Frankenstein Contracts:  The Workout Prohibition in Residential Mortgage Backed Securities*, 82 S. CAL. L. REV. 1075 (2010)
- Christopher L. Peterson, *Two Faces: Demystifying The Mortgage Electronic Registration System's Land Title Theory*, 53 WM. & MARY L. REV. 111 (2011).
- David P. Weber, *The Magic of the Mortgage Electronic Registration System: It Is and It Isn't*, 85 AM. BANKR. L.J. 239 (2011).
- Alan M. White, *Losing the Paper—Mortgage Assignments, Note Transfers and Consumer Protection*, 24 LOYOLA CONS. L. REV. 468 (2012).
- Jason H.P. Kravitt, SECURITIZATION OF FINANCIAL ASSETS (2D ED. 2003).
- AEQUITAS COMPLIANCE SOLUTIONS, INC., FORECLOSURE IN CALIFORNIA: A CRISIS OF COMPLIANCE 13 (2012).